Bart DIDDEN, Domenick Bologna, Fred DeCesare, Cabernet 119 Realty Corp., Opus 113 Corp., Pauillace 115 Realty Corp., 117 North Main Street Corp., Plaintiffs,

v.

The VILLAGE OF PORT CHESTER, The Board of Trustees for the Village of Port Chester, Gerald Logan, individually and in his official capacity as Village Trustee for the Village of Port Chester, Daniel Colangelo, Jr., individually and in his official capacity as Village Trustee for the Village of Port Chester, John M. Crane, individually and in his official capacity as Village Trustee for the Village of Port Chester, Gerard Diroberto, individually and in his official capacity as Village

Trustee for the Village of Port Chester, Anthony Napoli, individually and in his official capacity as Village Trustee for the Village of Port Chester, Robert Sorensen, individually and in his official capacity as Village Trustee for the Village of Port Chester, G & S Port Chester, LLC. and Gregory Wasser, Defendants.

No. 04 Civ. 0370(CM).

United States District Court,
S.D. New York.

Feb. 10, 2004.

Richard L. O'Rourke, Edward J. Phillips, Keane and Beane P.C., White Plains, NY, for Plaintiffs.

John Ernest Watkins, Jr., Law Office of John E. Watkins, Stuart Evan Kahan, Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP, Alan David Scheinkman, DelBello Donnellan Weingarten Tartaglia Wise & Wiederkehr, L, White Plains, NY, for Defendants.

## DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

McMAHON, District Judge.

In this action, Plaintiffs Bart Didden, Domenick Bologna, Fred DeCesare, Ca-

bernet 119 Realty Corp., Opus 113 Corp., Pauillac 115 Realty Corp. and 117 North Main Street Corp. seek an order staying a condemnation proceeding in state court. For the following reasons, Plaintiffs' motion is denied.

## BACKGROUND

This case arises out of a dispute between private developers over a development project associated with the Village of Port Chester's ("Port Chester") redevelopment of 27 acres of its downtown and waterfront area.

*The Redevelopment Project*

Port Chester had been seeking to redevelop its blighted waterfront and downtown areas since 1977 without success. In April 1998, Defendants G & S Port Chester, LLC. ("G & S"), and its principal, Defendant Gregory Wasser (together, the "Private Defendants") entered into a Land Acquisition and Disposition Agreement ("LADA") with Port Chester which named G & S as the designated developer of the Modified Marina Redevelopment Project (the "Redevelopment Project") in the urban renewal area of Port Chester known as the Marina Redevelopment Project Urban Renewal District (the "MUR District") in April 1998. The agreement called for development of approximately 500,000 square feet of modern retail establishments.

The Project was to be anchored by a Costco Wholesale warehouse store employing more than 150 people. The Project also includes a movie theater, a Marshall's department store, a Designer Shoe warehouse, a Bed, Bath & Beyond, a Michael's Arts & Crafts Store, as well as a Stop & Shop Supermarket. All of these stores are under construction today, employing dozens of union construction workers pursuant to agreements with several major contractors. Upon completion, the Project will offer jobs to more than 1,000 people,

produce millions in tax revenues to Port Chester and the State, and add over 2000 additional parking spaces to downtown Port Chester.

On July 14, 1999, following a public hearing, the Port Chester Board of Trustees (the "Board") adopted a resolution (the "1999 Findings") (1) making a Finding of public purpose for condemnation purposes under Article 2 of the New York State Eminent Domain Procedure Law and (2) approving the LADA and the designation of G & S as "the qualified and eligible redeveloper" for the Project (Affidavit of Greg Wasser ¶ 12 Exh. A.) The 1999 Findings stated that the Project "is designed to revitalize and beautify the Village's long neglected waterfront, eliminate a deteriorating downtown urban blighted area, bring sorely needed jobs to the Village, add to the Village's tax base, and importantly, bring the public back to the Village's downtown and waterfront." (Wasser Aff. ¶ 11 Exh. A.) Notice of the hearing was published pursuant to New York Eminent Domain Procedure Law (the "EDPL") § 202A, which requires the condemnor to publish notice of the hearing in newspapers at least 10, but not more than 30 days before the hearing. Although the EDPL does not require individual notice to the affected property holders, Defendants have attached a copy of the notice of public hearing and copies of signed receipts acknowledging that Plaintiffs received that notice. (Wasser Aff. ¶ 12 Exhs. D & E.) The EDPL allowed affected property owners 30 days after July 14, 1999 to appeal the Board's findings. EDPL § 207. Plaintiffs took no such appeal.

The Redevelopment Project became one of Westchester County's largest and most visible of such endeavors. It was the subject of substantial environmental review, public meetings and widespread publicity.

The Redevelopment Project called for the acquisition of thirty-eight separate properties and the relocation of more than one hundred individual families, most of whom were renting substandard or illegal apartments in deteriorated structures. Fifty-two businesses were also relocated. Lawsuits predictably ensued. G & S reached private settlements with most of the displaced business owners, landowners and residential tenants, and the Condemnation Part of the Supreme Court of Westchester County determined the remaining claims, some after trial.

Due to the Redevelopment Project's size, it has been undertaken in phases. G & S obtained building permits and proceeded with its first phase, which included Costco; it was completed in August 2002. At the same time, Defendants acquired land for subsequent phases and installed millions of dollars of public infrastructure improvements, including the construction of a waterfront park and new sea wall; new water, sanitary and storm sewers; new traffic controls, curbing and lighting and removal of old overhead utility lines.

While the first phase appears to have proceeded apace, the second phase of the Redevelopment Project was significantly delayed due to litigation initiated by various property owners and tenants. Although all cases were eventually decided in favor of Port Chester, the process took nearly two years. At the federal level, property owner William Brody, filed suit in this Court, alleging that the EDPL violated the Due Process Clause of the Fourteenth Amendment, both facially and as applied to him. In January 2001, the district court (Baer, J.) granted Brody's motion for a preliminary injunction, finding that defendants had failed to give Brody notice of the Findings of the Port Chester Board of Trustees or of his statutory right to appeal the Board's Findings. The injunction halted large portions of the Rede-velopment Project, at a significant cost to Defendants, until it was lifted by the Second Circuit on August 8, 2001. *See Brody v. Village of Port Chester*, 261 F.3d 288 (2d Cir.2001) (*"Brody I"*). Port Chester acquired title to Brody's property on August 28, 2001.

At the state court level, several owners challenged Port Chester's request for a writ of assistance pursuant to EDPL § 405(A), thereby preventing Port Chester from condemning their properties. Justice Peter Rosato of the Supreme Court of Westchester County granted Port Chester's writ in all cases. *See e.g., In Matter of Village of Port Chester, Greatest Estate Services of America, Inc.,* 00 No. 64481 (N.Y. Sup.Ct. Weschester Co. March 18, 2002); *In Matter of Village of Port Chester v. Luis Perez, d/b/a Luis Luncheonette,* 00 No. 3793 (N.Y. Sup.Ct. Westchester Co. March 27, 2002); *In Matter of Village of Port Chester Fabio Sorto, d/b/a Rinconcito Salvadoreno,* 00 No. 3793, (N.Y. Sup.Ct. Westchester Co. March 18, 2002). Plaintiffs appealed Justice Rosato's decisions to the Appellate Division, and were granted stays pending appeal of those decisions to the New York Court of Appeals. The stays were entered on March 28, 2002.

Progress on the second phase began again when the stays were lifted after the Court of Appeals dismissed the final three motions for leave to appeal on July 1, 2003. *See In Matter of Village of Port Chester, Greatest Estate Services of America, Inc.,* 100 N.Y.2d 577, 764 N.Y.S.2d 386, 796 N.E.2d 478 (2003); *In Matter of Village of Port Chester v. Luis Perez, d/b/a Luis Luncheonette,* 100 N.Y.2d 577, 764 N.Y.S.2d 386, 796 N.E.2d 478 (2003); *In Matter of Village of Port Chester v. Fabio Sorto, d/b/a Rinconcito Salvadoreno,* 100 N.Y.2d 577, 764 N.Y.S.2d 386, 796 N.E.2d 478 (2003). Port Chester finally had possession of all the parcels for the second

phase by July 11, 2003. (Affidavit of John Watkins ¶ 24.)

Soon thereafter, Port Chester began preparation for phase three of the process, which included the area containing Plaintiffs' property.

In 2002, Private Defendants had publically announced their intention to locate Walgreens, a national drug store chain, in the area of the MUR District commonly referred to as "Retail E." The announcement came after Private Defendants failed to come to terms with CVS Pharmacy, following protected negotiations. (Wasser Aff. ¶ 30, *see below.*) In June 2003, G & S sought amendments to its approved site plan for the MUR District, including "Retail E," in order to accommodate the Walgreens store. (Didden Decl. ¶ 20.) Plaintiffs believed that the site plan was flawed, and planned to comment on the flaws at the next public hearing, scheduled for July 21, 2003. (*Id.* ¶ 21.) At the hearing, G & S announced that it was withdrawing the proposed amendments. (*Id.* ¶ 22.) Port Chester ordered and received updated title reports in August 2003, a map in October 2003, and a metes and bounds description in November 2003. (Watkins Aff. ¶¶ 26–30.) As soon as the metes and bounds description was finalized, Port Chester assembled a Petition to condemn Plaintiffs' property. (*Id* ¶ 31.) The condemnation proceeding was commenced on November 6, 2003.

*The CVS Project*

Plaintiffs are private developers who own or control various adjoining properties in Port Chester that are situated in "Retail E" (the "Inside Properties"). In addition to the Inside Properties, Plaintiffs own or control four adjoining properties situated outside the MUR District (the "Outside Properties").

Since at least 1996, Plaintiffs have tried to redevelop both the Inside and Outside Properties as a CVS Pharmacy (the "CVS Project"). CVS showed little interest in the Project until Port Chester adopted the LADA agreement and designed G & S as the developer.

In late 2001, a CVS representative entered into negotiations with a G & S representative to discuss the possibility of locating a CVS entity in the "Retail E" area. (Declaration of Alfred Callegari ¶ 7.) The negotiations resulted in a proposal for development of a CVS store on "Retail E," which CVS ultimately rejected on May 8, 2002 because the size of the "Retail E" area was inadequate (*Id* ¶ 8.)

In March 2003, CVS approached Plaintiffs because the Inside Properties and Outside Properties, both owned by Plaintiffs, were, in combination, sufficiently large to accommodate CVS's spatial requirements. (Callegari Decl. ¶ 9; Declaration of Bart Didden, dated January 15, 2004 ¶ 25.) Plaintiffs secured various municipal approvals for the CVS Project and entered into a long-term lease of the Inside and Outside Properties with CVS. (Callegari Decl. ¶ 10.)

Plaintiffs entered into the CVS lease knowing full well that, under the LADA, the Private Defendants, as the designated developer of all sites within the MUR District (including the Inside Properties), "at some point, [ ] might attempt to buy or condemn [the Inside Properties]." (1/15/04 Didden Decl. ¶ 26.) As long ago as March 30, 1999, Plaintiffs had sent a letter to the Board (the "March 1999 Letter") stating that G & S's designation as "preferred developer" placed them at a competitive disadvantage in their negotiations with G & S, and asked that Port Chester remove the Inside Properties from the proposed project and site plan approval process. (Wasser Aff. Exh. C.) [1]

---

1. During the same month, William Brody also sought to exempt his property from the LADA · because he wanted to develop it in light of

The letter, which followed-up on comments made by Plaintiffs at a March 19, 1999 public hearing, is here reproduced in its entirety:

Dear Madam Mayor and Board Members:

We would like to thank the Board for its willingness to listen and take under advisement the public's numerous comments and suggestions regarding the revitalization of the marina district of our village.

We would like to take this opportunity to review the comments of March 18 and formally restate our request for your thoughtful consideration. We have owned the property known as 103–105 North Main Street for six years. Dick has owned and maintained some of the adjacent buildings for more than fifteen years. Approximately three years ago, when CVS was endeavoring to construct a pharmacy in Byram and failed due to opposition by the local residents, we had contact with CVS. We were at that time willing to build to their specifications, but they informed us that they were "not interested in Port Chester."

We were willing to develop then. We are still willing to develop and are ready. At this time, when G & S Investors is proposing a project for the downtown area, we find a synergy surrounding the project which is causing increased interest among many possible tenants, including CVS which formerly had no interest in Port Chester.

As you are aware, we have had a number of meetings in recent months, in the village with G & S and additionally with G & S and Peg/Park, the planners for G & S, in White Plains. These meetings have been promising, but they have borne no fruit. Hence, we find ourselves at a unique disadvantage. *We are anxious to develop our property, but by your actions, we are precluded because of the "preferred developer" status granted by you, the Board, upon G & S Investors with respect to "Retail E". We will continue to negotiate with G & S, but with the designation of "preferred developer", G & S enjoys the ultimate assistance of condemnation for those property owners with whom they are unable to finalize a deal.* (Emphasis added).

To our detriment, with their right to condemnation, G & S is not required or bound to ultimately negotiate in good faith. We have been discussing a proposed partnership whereby we would contribute all of the land necessary for the proposed building known as "Retail E". G & S would build the building and we assume, based on land value vs. construction costs and tenant acquisition, the percentages of ownership would be derived. This is a hypothetical formula and difficult to get agreement on. G & S, which we find open and cooperative to work with, has no urgency in finalizing a deal with us. They are not required to finalize a deal of this or any nature. They, by a matter of right, may go directly to condemnation and proceed on their way.

We have believed in Port Chester for many years, as evidenced by our investments. Our investments are not limited to just this one site. Besides real estate, our respective primary operating businesses employ many local residents and provide needed services not only to businesses but residents, as well.

Our impression from speaking with various Board members and hearing your comments made at the public meetings, we realize that this project doesn't fully satisfy your individual wishes 100%. Agreed. But just as you do, we want to

market created by the Redevelopment Project.

(Wasser Aff ¶ 27.)

see a doable project proceed in the village.

Since "Retail E," located on our property, was not included in the original proposal, the removal of our property in no way would hamper the integrity or functionality of the future project. Furthermore, since we still desire to develop the property and would so in concert with the style of the G & S proposal, even if not a partnership with G & S, we request the following action of the Board of Trustees:

To remove the property know as 103–105 North Main Street and the immediately adjoining properties from the proposed project and site plan approval process so that from a level playing field we may negotiate with G & S to a possible partnership.

If a partnership with G & S is not attainable for whatever reason, we are agreeable to commit, in a binding fashion, to construct a building in accordance with the G & S construction schedule on the site without delay after proceedings through the local approval process. Your fallback position is that at anytime it is deemed that we are not living up to our end of the agreement, you can always rededicate the preferred developer status on this property and move it forward or include the property in phase 2. Please permit us the opportunity to maintain and fully realize our investment potential without seeking the injunction of the courts to protect our

rights of ownership. We would like to explore the possibility of working with G & S and, ultimately, together with local financing and utilizing G & S, construct a building that compliments the entire project and have the ownership remain here in local hands. In our opinion, this course of action would be consistent with what is best for the village. Nobody wants to delay the progress of the village.

As you can see, we all share the same opinions. They may not be the best, but they are doable today.

Yours for a better village,

Domenick Bologna and Bart A. Didden.

In response to the letter, Port Chester declined to grant Plaintiffs' request for removal from the Redevelopment Plan, but urged the parties to convene a meeting to discuss the CVS Project.[2]

In fact, Plaintiffs and Private Defendants were already well acquainted. Plaintiffs participated in a public hearing convened by Defendants in March 1999. The March 1999 Letter also referred to "a number of meetings in recent months, in the village with G & S and additionally with G & S and Peg/Park, the planners for G & S, in White Plains." (Wasser Aff. Exh. C.) At their first meeting, G & S representative Gregg Wasser informed Plaintiffs that their properties were not part of the first phases of the development, but that before the Project reached their properties they would attempt to reach a

---

**2.** Plaintiffs argue that Port Chester should have exempted their properties because their development proposal of the "Retail E" area was better than Private Defendants' proposal. Whether Plaintiffs are correct or not in their contention is irrelevant. Port Chester was only required to have a rational basis for its decision to take Plaintiffs' property and no more, *see* takings discussion *infra.* In fact, Port Chester disliked Plaintiffs proposal, as Plaintiffs acknowledge in the March 1999 Let-

ter, because its would develop less property in the MUR zone than Private Defendants' plan. Plaintiffs' plan excludes from development Lot 11, a small centrally located vacant lot adjacent to Plaintiffs' properties. (Watkins Aff. ¶¶ 54–57.) The Redevelopment Project includes this lot. (*Id.* ¶ 58.) If Plaintiffs plan were to go forward, Lot 11 would remain undeveloped and isolated from any future development possibility.

fair settlement prior to initiating a condemnation proceeding. (Wasser Aff ¶¶ 24–25.) At another meeting, in 1999, the parties discussed the possibility of initiating a joint venture. (*Id.* ¶ 26.) Plaintiffs describe G & S's conduct at these meetings as "open and cooperative." (March 1999 Letter.)

At the July 21, 2003 public hearing, Plaintiffs voiced their concerns regarding G & S's proposed Walgreens site plan. Rather than engage in further public debate with Plaintiffs, G & S withdrew the amended site plan application and attempted, again, to negotiate with Plaintiffs directly. (Wasser Aff. ¶ 31.)

At the behest of Port Chester officials, including the Mayor of Port Chester, the parties met again on November 5, 2003.

The parties do not agree on what happened during the meeting. Plaintiffs allege that Private Defendants demanded that Plaintiffs either pay them $800,000 or give them a partnership interest in the project or Private Defendants would cause Port Chester to commence a condemnation proceeding against the Inside Properties and thereby divest Plaintiffs of title. Private Defendants characterize the meeting differently. According to Gregg Wasser, the G & S representative present at the meeting, he and G & S's attorney informed Plaintiffs Didden and Bologna that it would be a waste of time for the lawyers to argue over who had "better" rights to proceed with their project. In lieu of continuing the "rights" debate, Wasser claims to have offered to conduct a joint venture with Plaintiffs on the Retail E property. After Plaintiffs rejected the offer, Wasser determined that the only other way to proceed would be to establish a value for the property and for one side to buy-out the other. Wasser estimated that the profit on the CVS store deal would be $2 million. He then stated to Plaintiffs that whoever would be responsible for complet-

ing the Project should be given some credit for the additional work and was entitled to more than a 50–50 split. Based on the $2 million profit figure, Wasser proposed a buy-out figure of $800,000, in addition to the fair market value of the property, to be divided among Plaintiffs Didden, Bologna and DeCesare. He said he would be just as happy being bought out by Plaintiffs at that figure as he would be to buy Plaintiffs out. (Wasser Aff. ¶ 32.) He also informed Plaintiffs that the condemnation process was continuing, and that, if they could not reach an agreement, G & S expected that Port Chester would acquire the Inside Properties through condemnation.

On November 6, 2003, Port Chester commenced a condemnation proceeding against the Inside Properties in the Westchester County Supreme Court by filing a Notice of Petition and Petition (the "Condemnation Proceeding"). The petition seeks court permission authorizing Port Chester to file an acquisition map with the court and thereby gain title in fee to the Inside Properties pursuant to Article 4 of the EDPL. *See In the Matter of Village of Port Chester to Acquire Title To Certain Real Property Located In the Village of Port Chester, Westchester County, State of New York, and Designated on the Tax Maps of the Village of Port Chester as Section 2, Block 60, Lots 9, 10, 11, 12, 13, 14, 15, 16,* No. 18821/03 (N.Y. Sup.Ct. Westchester Co. filed November 6, 2003).

On November 24, 2003, the Port Chester Planning Commission held a public hearing on Plaintiffs' site plan application for the CVS Project, and granted preliminary site plan approval. (Declaration of Domenick Bologna, dated January 15, 2004 ¶¶ 21–22.) Following receipt of the site plan approval, Plaintiffs attended a meeting of the Board on December 1, 2003, in which they asked the Board to withdraw the pending Condemnation Pro-

ceeding. (1/15/04 Bologna Decl. ¶ 23.) On December 3, 2003, the Board held a special meeting to consider Plaintiffs' request. Although the request was denied, Port Chester allowed Plaintiffs additional time to respond to petition. (*Id.* ¶ 24.)

On December 17, 2003, Plaintiffs again petitioned Port Chester to amend the boundary line of the MUR District to remove the Inside Properties from the district (the "Rezoning Petition"). (*Id.* ¶ 25.) On January 6, 2004, the Board held another special meeting, during which it announced, upon the advice of its special counsel, that it would not act on the Rezoning Petition. (*Id.* ¶ 27.) Instead, it agreed to convene a meeting with the Board's counsel, Plaintiffs and Private Defendants. This meeting occurred on January 12, 2004. (*Id.* ¶ 28.) Private Defendants reiterated their November 5 offer to Plaintiffs at the January 12, 2003 meeting. Plaintiffs did not accept.

*The Instant Action*

On January 16, 2004, Plaintiffs filed a complaint and an order to show cause with this Court, seeking temporary and preliminary injunctive relief that would stay the Condemnation Proceeding, as well as declaratory and monetary relief pursuant to 42 U.S.C. § 1983 against Port Chester and its Board of Trustees (the "Public Defendants") and Private Defendants. As a first claim for relief, the complaint alleges that Defendants are depriving Plaintiffs of their property without due process in violation of the Fourteenth Amendment. The second claim for relief alleges that Defendants have effected a taking of Plaintiffs' property in violation of the Takings Clause of the Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. The third claim for relief alleges that Defendants have abused their condemnation powers in violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment. The fourth claim for relief alleges that Plaintiffs have been intentionally and unlawfully singled out and mistreated by Defendants in violation of the Equal Protection Clause. The fifth claim for relief seeks a declaration that the development agreement (LADA) between Public Defendants and Private Defendants is unconstitutional because it unlawfully delegates Public Defendants' eminent domain power to the Private Defendants. The sixth and seventh claims for relief seek preliminary and permanent injunctive relief as well as attorney's fees.

The crux of Plaintiffs' argument is that the Public and Private Defendants have conspired to deprive Plaintiffs of the use of their property in order to pursue their own private interests—specifically, their development plans with Walgreens—rather than the interests of the public. Plaintiffs ask this Court to enjoin the Condemnation Proceedings.

The Defendants have asked me to abstain from deciding these issues, which they allege are properly before the state court in the Condemnation Proceeding. In lieu of such a ruling, Defendants ask that I deny Plaintiffs' request for a preliminary injunction on the merits.

Following oral arguments on January 16, 2004, I granted Plaintiffs' request for a 10-day temporary restraining order and ordered Plaintiffs to post a $1,000 bond, which they did. On January 23, 3004, after full briefing and oral arguments, I lifted the TRO and denied Plaintiffs' request to enter a preliminary injunction enjoining the condemnation proceeding. This opinion sets forth the reasons for that decision.

## DISCUSSION

■ *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), instructs federal

courts to resolve questions of Article III jurisdiction before reaching the merits of a plaintiff's claim. The doctrine of abstention, however, is equitable, not jurisdictional, in nature. *Schachter v. Whalen*, 581 F.2d 35, 36 n. 1 (2d Cir.1978) (per curiam) ("*Younger* abstention goes to the exercise of equity jurisdiction, not to the jurisdiction of the federal district court as such to hear the case"). Therefore, I need not first reach the issue of abstention before deciding whether Plaintiffs are entitled to a preliminary injunction on the merits. *Id.*, at 36. Turning to that dispositive issue first, I find that they are not.

## I. Preliminary Injunction

### A. *Standard of Review*

In this Circuit, a preliminary injunction will be granted if the moving party shows that he will suffer irreparable harm absent injunctive relief and *either* (1) that he is likely to succeed on the merits of his claim; or (2) that there are sufficiently serious questions going to the merits to make them fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party. *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.2000); *Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 998–99 (2d Cir.1997). However, where the moving party seeks to enjoin government action taken in the public interest pursuant to a statutory scheme, that party must satisfy the more rigorous "likelihood of success on the merits" standard and may not resort to the lower "fair ground of litigation" test. *See Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir.1999).

I deny Plaintiffs' motion for a preliminary injunction because I find that Plaintiffs cannot establish a likelihood of success on the merits, and that the balance of hardships favors Defendants.

### B. *Likelihood of Success on the Merits*

Plaintiffs have not demonstrated that they are likely to succeed on the merits. Indeed, for the most part it is clear, not only that they are not likely to succeed, but that they cannot possibly succeed.

#### 1. *Statute of Limitations Bars Plaintiffs' Constitutional Claims*

First, Plaintiffs claims are time-barred. Plaintiffs claims are premised on 42 U.S.C. § 1983. In New York, § 1983 claims are subject to the New York State's 3–year statute of limitations governing general personal injury actions. *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). While state law provides the limitations period, the issue of when the federal cause of action accrued is a matter of federal law. *Fiesel v. Board of Ed. of City of New York*, 675 F.2d 522, 524 (2d Cir.1982). Under federal law, a cause of action under 42 U.S.C. § 1983 accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. *Barrett v. U.S.*, 689 F.2d 324, 333 (2d Cir.1982), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366.

Here, Plaintiffs had reason to know of the basis of their injury as soon as the Board announced its public purpose finding on July 14, 1999. On that date, Port Chester authorized a land disposition agreement with G & S which covered the use of eminent domain incidental to the implementation of the Redevelopment Project. It found that there was a legitimate public purpose for condemnation as a means of acquiring property for the Project.

Plaintiffs now complain that no public purpose underlies the pending condemnation of their property, and that Port Chester unconstitutionally delegated its condemnation powers to G & S. But the March 30, 1999 letter from Plaintiffs to the

Port Chester Board of Trustees, cited above, shows that Plaintiffs were fully aware that such a finding would, if not immediately overturned, expose them to the prospect of condemnation. Plaintiffs do not dispute receipt of the notice of public hearing submitted to the Court by Defendants. This action was commenced on January 16, 2004, nearly five years after Plaintiffs sent their March 30, 1999 letter, and well over four years after the Village issued a public purpose finding and decided to enter into a land disposition agreement with G & S. Therefore, I find that all of Plaintiffs' claims are time-barred.

### 2. Plaintiffs Were Accorded All the Process They Were Due

■ In addition, Plaintiffs have no likelihood of success on their due process claims. Procedural due process requires that the Condemnation Proceeding be fair and reasonable and that the government not act arbitrarily or unfairly interfere with Plaintiffs' property rights, *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986), while substantive due process restricts the power of the state from regulating in an arbitrary matter. *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir.1999).

Plaintiffs have no claim under either theory. As to procedural due process, Defendants have complied fully and fairly with the EDPL. It was up to Plaintiffs to seek judicial review of Port Chester's Article 2 determination if they so desired. At this point, Plaintiffs remedy is limited to contesting the EDPL Article 4 Petition and making an Article 5 claim for just compensation. And, that is all the process that is due them. *Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 880–881 (2nd Cir.1996). As to substantive due process, the EDPL has been held to meet all constitutional requirements. *See Frooks v.*

*Town of Cortlandt*, 997 F.Supp. 438, 452 (S.D.N.Y.1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999). Thus, Plaintiffs cannot succeed on their due process claims.

### 3. Plaintiffs' Takings Claim Cannot Succeed

Plaintiffs are not likely to prevail on their takings claim.

■ The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, precludes the taking of private property for *public use* without just compensation. *Dolan v. City of Tigard*, 512 U.S. 374, 383–84 n. 5, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Defendants contend that the Redevelopment Project (including the Inside Properties) serves a clear public purpose—the redevelopment of the blighted downtown area of Port Chester. This was specifically recognized by the Second Circuit—whose rulings I am hardly in a position to contravene—when it vacated the *Brody* injunction. *See Brody I*, 261 F.3d at 290–91. The alleged "bribe" by Private Defendants, even if it was a "bad faith" offer, could not in any way have transformed that public purpose into a private purpose.

Insofar as Plaintiffs argue only that the taking of their property, not the overall Redevelopment Project, is not for a public use, Plaintiffs' arguments are also without merit. As this Court has previously held

> Once a legitimate public purpose for the overall project is conceded ... the court cannot get involved in parsing the particular degree of public or private motivation behind the inclusion of a particular site in the Project area, so long as that inclusion could rationally be related to the public purpose of the plan as a whole.

*Rosenthal & Rosenthal Inc. v. New York State Urban Development Corp.*, 605

F.Supp. 612 (S.D.N.Y.1985), *aff'd,* 771 F.2d 44, 45 (2d Cir.1985). Plaintiffs have failed to adduce any evidence that the taking of their property was not rationally related to the purpose of the overall Redevelopment Project.[3] And, under *Berman v. Parker,* 348 U.S. 26, 35–36, 75 S.Ct. 98, 99 L.Ed. 27 (1954), I will not substitute this Court's judgment for that of the municipality as to where the appropriate boundary of the Redevelopment Project should be located.

Thus, I find that the Plaintiffs have no likelihood of success of showing that the condemnation of the Inside Properties does not serve a public purpose.

### 4. Plaintiffs Have Waived Their Right to Challenge the Public Purpose of the Redevelopment Project

Even if Plaintiffs could have made a showing of non-public use, it is too late for them to do so now. Port Chester issued its public purpose findings in July 1999. Under the EDPL, Plaintiffs and others were allowed thirty days to challenge the public purpose finding in state court. EDPL § 207. Plaintiffs failed to do so. Plaintiffs do not (and cannot) allege that they failed to receive notice of Port Chester's declaration of public purpose. To allow Plaintiffs to challenge the public purpose of the Redevelopment Project now would contradict the express provisions of the EDPL, and undermine New York's constitutional unitary scheme for the condemnation of property.

### 5. Rooker–Feldman Bars This Court From Revisiting the Public Purpose Finding

▮ Under the *Rooker–Feldman* doctrine, a federal district court does not have jurisdiction to review a claim that has been previously decided by a prior state court proceeding. *D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 482, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Phifer v. City of New York,* 289 F.3d 49, 55–56 (2d Cir.2002).

Federal district courts lack subject matter jurisdiction "over cases that effectively seek review of judgments of state courts." *Phifer,* 289 F.3d at 55. The only means by which a party may seek federal review of a state court judgment is by petitioning the Supreme Court for certiorari. *Id.* Moreover, issues that are directly decided or are "inextricably intertwined" with a state court decision are barred from federal review. *Feldman,* 460 U.S. at 486–87, 103 S.Ct. 1303, 75 L.Ed.2d 206. *Rooker–Feldman* extends to lower state court judgments. *Campbell v. Greisberger,* 80 F.3d 703, 707 (2d Cir.1996). Claims are "inextricably intertwined" when entertaining the second action would allow the party to "collaterally attack" the state court decision. The Second Circuit has stated that:

> the Supreme Court's use of "inextricably intertwined" means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding (as either the plaintiff or defendant in that proceeding), subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion.

*Moccio v. New York State Office of Court Admin.,* 95 F.3d 195, 199–200 (2d Cir. 1996).

---

**3.** Plaintiffs acknowledge that their CVS proposal did not fully satisfy the Board in their March 1999 letter (Wasser Aff. Exh. C). Unlike Plaintiffs' proposal, Private Defendants' proposal includes Lot 11, a vacant lot adjoin-ing Plaintiffs' property that would otherwise be impossible to develop. Thus, it was certainly not *per se* irrational for Port Chester to refuse Plaintiffs request to remove the Inside Properties from the Redevelopment Plan.

However, even if res judicata or collateral estoppel do not preclude the second suit, the *Rooker–Feldman* doctrine still may prevent maintenance of a federal action if "the litigant in federal court seeks relief that would effectively void or reverse a related state court ruling." *Wanderlust Pictures, Inc. v. Empire Entertainment Group*, No. 01 CV 4465, 2001 WL 826095, at *3 (S.D.N.Y. July 19, 2001).

Under principles of collateral estoppel, Plaintiffs' takings claim will be barred if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Moccio*, 95 F.3d, at 200 (quoting *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir.1995)). Both elements are present here. First, that the Redevelopment Project constituted a "public purpose" was actually and necessarily determined during the Article 2 phase of the Condemnation Proceedings in July 1999. Second, EDPL § 207 provided Plaintiffs with a full and fair opportunity to litigate the issue of public purpose in state court; indeed, under the EDPL, it was Plaintiffs' only provided forum for litigating the issue.

Additionally, the Article 2 "public purpose" determination was the predicate for numerous other individual judgments and court approved settlements previously reached between Port Chester and other lot owners in the MUR District pursuant to Article 4 in the Condemnation Proceeding. *See e.g., In Matter of Village of Port Chester, Greatest Estate Services of America, Inc.*, 00 No. 64481 (N.Y. Sup.Ct. Weschester Co. March 18, 2002); *In Matter of Village of Port Chester v. Luis Perez, d/b/a Luis Luncheonette*, 00 No. 3793 (N.Y. Sup. Ct. Westchester Co. March 27, 2002); *In Matter of Village of Port Chester v. Fabio Sorto, d/b/a Rinconcito Salvadoreno*, 00

No. 3793, (N.Y. Sup.Ct. Westchester Co. March 18, 2002). Each of these decisions, have been affirmed by the New York State Appellate Division with leave to appeal denied by the New York State Court of Appeals. *In Matter of Village of Port Chester, Greatest Estate Services of America, Inc.*, 303 A.D.2d 416, 755 N.Y.S.2d 862 (2d Dep't 2003); *In Matter of Village of Port Chester, Luis Perez, d/b/a Luis Luncheonette*, 303 A.D.2d 416, 755 N.Y.S.2d 861 (2d Dep't 2003); *In Matter of Village of Port Chester v. Fabio Sorto, d/b/a Rinconcito Salvadoreno*, 303 A.D.2d 416, 755 N.Y.S.2d 860 (2d Dep't 2003).

Were I to rule now that Private Defendants' actions had somehow transformed the public purpose of the Redevelopment Project into a private one, it would have the effect of undermining or voiding all of those prior state court rulings. This is precisely the situation that the *Rooker–Feldman* doctrine was intended to avoid. Thus, Plaintiffs' Takings Claim is also likely to be barred by *Rooker–Feldman*.

### 6. Plaintiffs' Equal Protection Claim Will Not Succeed

Plaintiffs are not likely to succeed on their Equal Protection claim.

To establish an Equal Protection violation, Plaintiffs must show that (1) compared with others similarly situated, they were selectively treated and (2) they were singled out for such disparate treatment as a result of a malicious or bad faith intent to injure them. *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir.1996).

Plaintiffs' property was a part of the EDPL Article 2 determination, which includes 37 other lots. Plaintiffs, like all other condemnees, had the chance to challenge the Article 2 determination. Like all others, they have the opportunity to contest Port Chester's Petition seeking an order and judgment permitting the filing

of the acquisition map as to their parcel and the vesting of title in Port Chester under Article 4 of the EDPL. Like all other condemnees, Plaintiffs are entitled to be compensated under Article 5 of the EDPL and can always make a claim within the time frame specified by the Supreme Court in the Notice of Acquisition. Finally, because Articles 3, 4 and 5 require resolution on a case-by-case/lot-by-lot basis, there is no requirement that all condemnees receive the same value for their property, so it is unlikely that Plaintiffs will be able to show disparate treatment based on the amount of compensation they receive for the Inside Properties.

### 7. No Unlawful Delegation

■ Plaintiffs are unlikely to succeed on their claim that the LADA is unconstitutional because it unlawfully delegates Public Defendants' eminent domain power to the Private Defendants.

Plaintiffs argue that the terms and conditions of the LADA are such that Port Chester has essentially handed-over its condemnation authority to G & S. If true, this would contravene the well-settled rule that a State cannot delegate its power of eminent domain to a private party. *See Contributors to Pennsylvania Hospital v. City of Philadelphia,* 245 U.S. 20, 23–24, 38 S.Ct. 35, 36, 62 L.Ed. 124 (1917) (citations omitted); *see also Kaufmann's Carousel, Inc. v. City of Syracuse Industrial Development Agency,* 301 A.D.2d 292, 750 N.Y.S.2d 212 (4th Dep't 2002), *leave to appeal denied,* 99 N.Y.2d 508, 757 N.Y.S.2d 819, 787 N.E.2d 1165 (2003).

But Plaintiffs have been aware of the terms of the LADA for quite some time. The LADA was adopted in 1999. EDPL created a mechanism for Plaintiffs to challenge LADA as being overly beneficial to Private Defendants at that time. Having made the determination not to challenge it then, they cannot now come to this Court to do so now, when the Redevelopment Project has moved forward at great expense to both Public and Private Defendants.

### C. Balance of the Equities

■ Even if there were serious questions going to the merits of Plaintiffs' federal claims—which there are not—the balance of the equities tips decidedly in favor of Defendants.

The Second Circuit has held that

Whenever a request for a preliminary injunction implicates public interests a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief. Otherwise a claim that appears meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest.

*Brody I,* 261 F.3d 288, 290 (2d Cir.2001) (quoting *Time Warner Cable v. Bloomberg, L.P.,* 118 F.3d 917, 929 (2d Cir.1997)). Here, as in *Brody I,* it is unquestionable that were I to enjoin the Condemnation Proceeding, Defendants and the public in general would suffer substantially greater harm than Plaintiffs would suffer if I were to allow the Condemnation Proceeding to proceed.

First, Defendants are already well on their way to completing the second phase of the Redevelopment Project, consisting of approximately 300,000 square feet of national credit retail. An injunction, and the resulting delay caused by continuing litigation, would jeopardize all of the leases with the national tenants which Defendants would use to obtain credit to finance the construction of the next phase of the development. (Wasser Aff. ¶ 40.) Defen-

dants assert without contradiction that losses from such delay could total in the tens of millions of dollars. (*Id.*) Second, Defendants have borrowed more than $120 million to date, which is partially secured by mortgages on the Redevelopment Project land. These loans are to be repaid out of the rent proceeds received from tenants upon the completion of the Project. These tenants include several major national retail establishments. The rent roll for the next phase of the Project, due to be completed in Fall 2004, exceeds $7 million per annum ($600,000 per month). (*Id.* ¶ 41.) A loss of even a few months rent therefore amounts to millions of dollars. Third, Port Chester is due to receive more than $1.5 million per year in new tax revenue from the Redevelopment Project. Further delay in the Project would therefore hamper Port Chester's ability to allocate this revenue to needed services. The last time the Redevelopment Project was halted by litigation, in 2002, it cost both Port Chester and G & S millions of dollars. There is no doubt that the same result would occur here if I were to grant Plaintiffs' request.

By contrast, it is unclear that Plaintiffs would suffer any harm were I to deny their request for an injunction. Plaintiffs argue that they will be harmed by the violation of their constitutional rights, the unlawful taking of their property and the loss of a unique investment opportunity. To the extent that Plaintiffs have allegedly suffered constitutional harms due to the nature of the Condemnation, the time for them to raise these issues was during the Article 2 proceeding. To the extent that Plaintiffs will allegedly suffer monetary harm for the taking of their property and the loss of an investment opportunity, Plaintiffs can address those concerns in the Article 5 proceeding. They have a constitutional right to just compensation and there is no reason to believe that just compensation will not be paid.

As discussed above, the long history of this Redevelopment Project and the litigation surrounding it, as well of the course of dealing between the parties, indicate to me that this dispute is really nothing more than a local land use matter, which can and should be resolved by the state court. *Eddystone Equipment and Rental Corp. v. Redevelopment Authority of the County of Delaware* (1988 WL 52082, at *1, *aff'd*, 862 F.2d 307 (3d Cir.1988)) ("an injunction would require federal court involvement in local land use decision-making, a result never intended by Congress in enacting § 1983 ... The essentially local character of this dispute and the availability of constitutional remedies in state court argue strongly against federal intervention, although the action is cast as a civil rights violation").

## II. Abstention

Although I have denied Plaintiffs' preliminary injunction motion because Plaintiffs are unlikely to succeed on the merits, I note that *Younger* abstention also weighs in favor of denying Plaintiffs the remedy they seek.

### A. Standard of Review

In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court established the principle that federal courts generally should not enjoin or interfere with ongoing state court proceedings. *Younger* held, specifically, that a federal court may not enjoin pending state court criminal proceedings absent bad faith, harassment or other unusual circumstances calling for equitable relief.

In *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), the Court extended the reasoning of *Younger* to state administrative proceedings. *Middlesex* invoked a three-prong test for ab-

stention in non-criminal proceedings: (1) whether the administrative proceedings constitute ongoing state judicial proceedings; (2) whether the state proceedings implicate important state interests; and (3) whether state procedures are available that allow the plaintiff to raise his federal claim in state court. *Middlesex*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). An affirmative finding of all three factors compels a district court to abstain unless the state proceeding was commenced in bad faith or was filed for the purpose of harassing the plaintiff, or if other unusual circumstances warrant the court's intervention. *Middlesex*, 457 U.S. at 435, 102 S.Ct. at 2523.

A district court should not abstain "where a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass." *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir.1994), *cert. denied sub nom.*, 513 U.S. 985, 115 S.Ct. 480, 130 L.Ed.2d 393 (1994). "In such cases, a showing of retaliatory or bad faith prosecution establishes irreparable injury for the purposes of the *Younger* doctrine, and the expectations for success of the party bringing the action need not be relevant." *Id.* (citations omitted).

In this case, the state Condemnation Proceeding, which commenced on November 6, 2003, two months before this action was filed, is an ongoing state judicial proceedings. And the pending Condemnation Proceeding implicates important state interests. In fact, this Court has previously found that New York eminent domain proceedings always satisfy the first two prongs of *Younger*. *Broadway 41st Street Realty Corp. v. The New York State Urban Development Corp.*, 733 F.Supp. 735, 740–742 (S.D.N.Y.1990). Accordingly, Plaintiffs' only basis for federal interven-

tion is that (1) they have not had an adequate opportunity to raise their federal claims in the Condemnation Proceeding; and/or (2) that the Condemnation Proceeding was commenced in bad faith.

### B. *Younger Abstention*

#### 1. *Adequate Opportunity in State Court*

■ A district court will abstain from exercising jurisdiction over a state action if the state action provides the plaintiff with an adequate opportunity to raise its constitutional claims. *Middlesex County*, 457 U.S. at 432, 102 S.Ct. at 2521.

Plaintiffs' argument hinges on whether the New York EDPL provides an adequate mechanism for addressing Plaintiffs federal constitutional claims. It does.

The purpose of the EDPL is to regulate the procedure for condemnation of private property. The EDPL sets forth a staged process for addressing the various issues that arise during a condemnation—each stage being the subject of its own section (article) of the EDPL. However, as Judge Leisure recognized in *Broadway 41st Street Realty Corp.*, the five stages of EDPL constitute a single, unitary proceeding. *Broadway 41st Street Realty Corp.*, 733 F.Supp. at 743.

The Article 2 phase conclusively determines the need and location of a public project. Article 2 requires the condemnor of a property to conduct the public hearing upon public notice. EDPL §§ 202–203. Following the public hearing, the condemnor must issue a determination and findings, which must be published. EDPL § 204. Aggrieved persons may then seek judicial review in the Appellate Division by filing a petition within thirty (30) days after the completion and publication of the determination and finding. EDPL § 207.

The scope of review under EDPL § 207 includes whether (1) the proceeding was in conformity with the federal and state constitutions; (2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority; (3) the condemnor's determination and findings were made in accordance with the statutory procedures; and (4) *and the public use, benefit or purpose will be served by the proposed acquisition.* EDPL § 207(c) (emphasis added). Later judicial review is precluded as to "any matter which was or could have been determined" by the Appellate Division, including a non-public use claim. EDPL § 208.

Article 3 of the EDPL controls the making of compensation offers for property that has been forced to be subject to condemnation for a public purpose. The preamble to Article 3 states that the public policy of New York favors negotiated settlements. EDPL § 301. However, the condemnor

> fulfills[ ] the requirements of EDPL § 303 by making an offer to respondent property owners that 'it believes to represent just compensation for the real property to be acquired.' There is no requirement that petitioner 'plead or prove, as a prerequisite to the acquisition of property by eminent domain, that it negotiated in good faith with the [property] owner[s].'

*National Fuel Gas Supply Corp. v. Town of Concord,* 299 A.D.2d 898, 899, 752 N.Y.S.2d 187, 189 (4th Dep't 2002); *Matter of County of Tompkins,* 237 A.D.2d 667, 669–70, 654 N.Y.S.2d 849, 851 (3d Dep't. 1997). "If a property owner believes that an offer is inadequate, the remedy is to commence an action in the Court of Claims pursuant to EDPL article 5." *Town of Concord,* 299 A.D.2d at 899, 752 N.Y.S.2d at 189.

Following an Article 2 determination and finding and an Article 3 negotiation or offer, the condemnor may commence proceedings to acquire the necessary property under Article 4. EDPL § 401. Article 4 proceedings are commenced when a petition is filed in the Supreme Court, served by registered or certified mail upon property owners and published. The petition must allege compliance with the provisions of Article 2; it need not allege compliance with Article 3. EDPL § 402; *see also Matter of Consolidated Edison Co. of New York, Inc.,* 143 A.D.2d 1012, 1013, 533 N.Y.S.2d 591, 592 (2d Dep't 1988) (denying leave to amend answer under Article 4 because compliance with article 3 of the EDPL was not a constitutional prerequisite to the acquisition of the respondent's property pursuant to Article 4 of the EDPL). Property owners are permitted to appear and interpose a verified answer, which must specifically deny each material allegation controverted by the owners, and which may allege "new matters constituting a defense to the proceeding." The Court may grant the petition upon "proof to its satisfaction" that the procedural requirements of the law have been met. EDPL § 402(b)(5). Thus, Article 4 effects the taking of the property. If, after title passes, the amount to be paid for the property remains in dispute, compensation is adjudicated in the Court of Claims pursuant to Article 5.

Plaintiffs argue that, because the Condemnation Proceeding is now at the Article 4 stage, and because Article 4 does not allow a state court to consider non-procedural issues, including constitutional claims, Plaintiffs were precluded from raising in state court their claim that their property is being taken for a non-public purpose.

That is true, but of no moment. Plaintiffs allege that Private Defendants have somehow commandeered the condemnation proceedings and subverted them for pri-

vate rather than public benefit. But, Port Chester's findings and determination of July 14, 1999 under Article 2 stated that the Redevelopment Project constituted a "public use." (Wasser Aff. Exh. A.) Plaintiffs, who were in negotiation with CVS as long ago as 1996 (and whose letter of March 30, 1999 indicates a renewed interest in the area by CVS), could have appealed Port Chester's July 14, 1999 determination within 30 days as required by EDPL § 207. That was the moment to argue that the LADA unduly favored Defendants purely private interests. Indeed, because I am required to "view[ ] the state court condemnation proceedings as one unified judicial proceeding which fully provides plaintiffs with the opportunity to raise their federal constitutional claims, albeit at different stages in the proceedings," *Broadway 41st St. Realty Corp.*, 733 F.Supp. at 743, I am constrained to conclude that Port Chester's "public use" determination under Article 2 is "part" of the ongoing Condemnation Proceedings, and that Plaintiffs had adequate opportunity to raise their concerns regarding the alleged "private use" of the Redevelopment Project in state court at the appropriate time in those proceedings. They chose not to do so. They cannot complain about it now.

Plaintiffs argue that Private Defendants showed their true color by attempting to coerce $800,000 from Plaintiffs as a condition of allowing them to develop the Inside Properties with CVS. They suggest that until the last few months they could not have known that the Private Defendants were acting for a private benefit—or more accurately, that they head turned from public benefit actors to private benefit actors. But the Private Defendants efforts to negotiate some sort of resolution with Plaintiffs that would accommodate both parties' economic interests does not retroactively transform the purpose of the Redevelopment Project (or any portion of it) from public to private. It merely recog-

nizes that, as with so many things in life, whether something is fair or not is all a matter of money.

*Brody v. Village of Port Chester*, 345 F.3d 103 (2d Cir.2003) ("*Brody II* "), cited by Plaintiffs in support of their arguments, does not auger a contrary result. In *Brody II*, the Second Circuit considered an appeal on an action brought by property owner William Brody against Port Chester for failing to provide him notice of the public hearing regarding condemnation of his commercial property in connection with the same redevelopment project that is at issue in this case. The Court of Appeals found that Brody had standing to assert his due process challenge in federal court because his constitutional claims could only have been raised in an Article 2 EDPL proceeding, not under Article 4, and the Article 2 phase was long since past. *Id.*, at 114–116. But, *Brody II* applies only where the property owner had no notice of the Article 2 findings, and therefore no opportunity to challenge them in a timely fashion. No such allegation has been made here. Indeed, as noted above, Defendants attach to their submissions a copy of the Public Notice for the July 14, 1999 public hearing that was sent to Plaintiffs along with signed return receipts acknowledging that Plaintiffs had received the Notice. (Wasser Aff. Exhs. D & E.) In their March 1999 Letter, Plaintiffs evidenced full awareness of what was going on in terms of the Redevelopment Project and the LADA. They even acknowledged that their properties were subject to condemnation. Thus, Plaintiffs clearly had the opportunity to raise their concerns about the "private" nature of the redevelopment within 30 days of the issuance of the "public use" finding—nearly five years ago.

Plaintiffs protest that they have no issue with the Redevelopment Project itself or with Port Chester's July 14, 1999 finding

of public use. Rather, Plaintiffs argue that the problem is with the LADA because it "provides Private Defendants with an unlawful degree of control over the Village's exercise of eminent domain power" (Pl. Reply Brief at 11) and that, as a result, "the Condemnation Proceeding has been and continues to be used as a club by the Private Defendants in an effort to steal a piece of the CVS Project" (Pl. Reply Brief, at 14.) But, the time for Plaintiffs to object to LADA on the ground that it provided a private rather than a public benefit (the real thrust of their argument) was during the Article 2 proceedings, of which they were given fair notice. That time has long since passed. Plaintiffs are barred from raising the issue.

Nor can Plaintiffs argue that the taking of the Inside Properties specifically is not within the ambit of the Redevelopment Project's public purpose. As discussed above, that claim is barred by *Rosenthal & Rosenthal Inc. v. New York State Urban Development Corp.*, 605 F.Supp. 612 (S.D.N.Y.1985), *aff'd*, 771 F.2d 44, 45 (2d Cir.1985). Having conceded, as they must, that the implementation of the Redevelopment Project was for a public purpose, Plaintiffs, in seeking federal intervention, are now limited to showing that the inclusion of the Inside Properties in the overall redevelopment scheme was not rationally related to the public purpose of the plan as a whole. No such showing has been made on the record before me.

Plaintiffs thus had adequate opportunity to raise their federal claims in state court.

### 2. Bad Faith

█ Plaintiffs next argue that I should intervene in the Condemnation Proceeding because it was brought in bad faith. *See Broadway*, 733 F.Supp. at 744 ("A federal district court should not abstain from interfering with state court proceedings if those proceedings have been brought in bad faith"). Plaintiffs allege that Private Defendants used the LADA to pressure Plaintiffs to pay them $800,000 in order to avoid the condemnation of their property, or alternatively, to gain a portion of the profits from Plaintiffs' CVS Project, and that Public Defendants initiated the Condemnation Proceeding solely in retaliation for Plaintiffs' refusal to pay the $800,000 to Private Defendants. Defendants counter that the $800,000 figure was an estimate of what it believed, when combined with the fair market value of the Inside Properties, to represent a fair valuation of the total value of the Inside Properties, including Plaintiffs' expected profit from CVS Project. Private Defendants proposed that either side could buy-out the other for this amount.

The Second Circuit generally requires that a district court hold a full evidentiary hearing on factual disputes before making credibility findings on the issue of bad faith. *See Kern v. Clark*, 331 F.3d 9, 12 (2d Cir.2003). In *Kern*, however, the district court erred by failing to address the plaintiff's evidence that defendants "repeatedly and vigorously prosecuted weak cases against him at the behest of politically-connected complainants," which was precisely the basis of plaintiff's bad faith claim. *Id.* Here, however, the parties' factual disputes (which are really disputes about the meaning of certain words that everyone agrees were said) are immaterial to the question of bad faith. The bad faith argument is, therefore, inadequate as a matter of law.

Undermining Plaintiffs' suggestion of bad faith is the simple fact that Defendants had *no obligation whatsoever to negotiate*, in good faith or otherwise, with Plaintiffs. They merely had the obligation to offer Plaintiffs just compensation prior to acquiring title to their property pursuant to the EDPL. And, the offer is not the

last word on the subject; determination of the adequacy of compensation is a matter that can be raised in state court during the Article 5 proceedings.

The same holds true for any claim that the Article 4 phase of condemnation, as to the Inside Properties, was initiated in bad faith. Plaintiffs rely on *Gubitosi v. Kapica*, 895 F.Supp. 58 (S.D.N.Y.1995) and *Brooklyn Institute of Arts and Sciences v. City of New York*, 64 F.Supp.2d 184, 196 (E.D.N.Y.1999) (*"Brooklyn Institute"*). In *Gubitosi*, this Court found that allegations of bad faith were sufficient to avoid abstention where "the basic thrust of [plaintiff's] complaint is that the entire proceedings were initiated to retaliate against constitutionally protected conduct." *Gubitosi*, 895 F.Supp. at 62. In *Brooklyn Institute*, the court refused to abstain where it found that a state court action by New York City "was conceived and initiated as an instrument to pressure the Museum and to compel it to … remove specific objectionable works … and it is part of an ongoing effort to retaliate against and deter plaintiff's exercise of First Amendment rights." *Brooklyn Institute*, 64 F.Supp.2d at 196.

Here, as noted above, the Condemnation Proceeding is one unified judicial proceeding. It began at the Article 2 phase, back in July 1999. As a result of those Article 2 determinations, which cannot now be judicially challenged, Plaintiffs' property (and all other properties within the MUR District) has been found to be subject to condemnation for a public purpose. Plaintiffs have not suggested that the proceeding was commenced in bad faith at that time. Nor does the record support such a finding. Plaintiffs have had numerous opportunities to voice their concerns at public hearings and Defendants made repeated efforts to negotiate with Plaintiffs. It is clear that, even prior to the start of the Redevelopment Project, Defendants went out of their way to ensure that Plaintiffs' requests received a fair hearing.

Neither does the fact that, "For more than four years after the 1999 approval of the MMRP, G & S expressed no interest and took no action with respect to the properties comprising Retail E" have any bearing on Port Chester's right to initiate a condemnation proceeding against Plaintiffs' properties. Even if true, this fact could not have led Plaintiffs to assume that the public purpose of the Redevelopment Project had been abandoned as to their properties. (1/15/04 Bologna Decl. ¶ 16; *see also* Declaration of Bart Didden, dated January 15, 2004 ¶ 26.) Plaintiffs should have known, as a matter of law, and did know, as a matter of fact, (1/15/04 Didden Decl. ¶ 26), that Defendants had the right to initiate the phase three proceeding at any point within 10 years of the commencement of the Condemnation Proceeding before it would be considered abandoned. *250 West 41st Street Realty Corp. v. New York State Urban Development Corp.*, 277 A.D.2d 47, 48, 715 N.Y.S.2d 407, 408 (1st Dep't 2000), *leave to appeal denied*, 96 N.Y.2d 705, 723 N.Y.S.2d 132, 746 N.E.2d 187 (2001).

Plaintiffs' argument is disingenuous for still another reason. Until the summer of 2003, between the Brody injunction and the stay entered by the Appellate Division, the earlier stages of the Redevelopment Project were at a standstill. It is only in the last six or seven months that Defendants have been free to turn their attention to the next phase of the Project. That the next phase would involve Plaintiffs' properties was signaled by the Walgreens' announcement, which was made in 2002. And, the preparations to condemn the Inside Properties clearly began well before November 5, 2003. On this record, it is impossible to infer bad faith commencement of proceedings.

Finally, Plaintiffs argue that *Aaron v. Target Corp.*, 269 F.Supp.2d 1162 (E.D.Mo.2003) counsels against abstention in this instance. Target Corp. involves facts that are similar, but not identical, to those facing me today. In *Target*, property owners brought an action under § 1983 against Target Corp., the City of St. Louis and the Land Clearance Redevelopment Authority of the City of St. Louis ("LCRA"), seeking to enjoin state condemnation proceedings on the allegation that their property was being taken for private rather than public use in violation of their constitutional rights under the Fifth Amendment. The district court found that abstention was not justified because the first and third prongs of *Younger* were not met. In addition, the court found that the bad faith exception applied based on the following:

> Plaintiffs have presented evidence that the state court condemnation action is not the product of a legitimate legislative or municipal finding of blight, but rather is the result of LCRA and the City allowing Target to usurp the municipal process and power necessary to find the Properties subject to condemnation, in order to take plaintiffs' Properties for Target's own private purpose. Plaintiffs presented evidence that (1) Target proposed a renegotiation of the Trust Target Lease, but did not attempt to address the issue further after receiving Trust Plaintiffs' counterproposal; (2) Target told the City it might abandon the Properties because it had been unable to reach an agreement with plaintiffs as to a sale price, although no discussions ever took place between Target and plaintiffs concerning a possible sale of the Properties; (3) Target authored the Blighting Study, or at least the critical part of it finding that the Properties were blighted or insanitary; (4) without plaintiffs' knowledge, Target presented a redevelopment plan for the Properties,

under which it would be the redeveloper; and (5) plaintiffs received no notice of the hearing before the Board of Aldermen on November 30, 2002, at which the Board considered declaring the Properties blighted, approving Target's proposed redevelopment plan, and authorizing LCRA to acquire the Properties through the exercise of eminent domain, because the City mailed notice of this hearing to Trust Plaintiffs "in care of Target" at its Minneapolis headquarters and Target apparently failed to forward the notice.

*Target Corp.*, 269 F.Supp.2d, at 1172. Thus, *Target Corp.* involved a situation where the private entity surreptitiously manipulated a locality's eminent domain procedure from its inception solely to take ownership in the building it was leasing for the purpose of building a new Target store on the site. *Id.*, at 1165.

The same simply cannot be said about this case. Because local eminent domain procedures differ materially among jurisdictions, the Missouri court's decision in *Target Corp.* has limited precedential value for this Court's evaluation of Plaintiffs' bad faith claim under the EDPL. Nevertheless, even assuming for present purposes that *Target Corp.* were relevant, it is easily distinguishable. First, unlike in *Target Corp.*, the Redevelopment Project involves a huge redevelopment comprised of some 27 acres of Port Chester's downtown and waterfront, provides for the construction of over 500,000 square feet of retail space, and includes only about 0.5 acres of Plaintiffs' property (about 2% of the MUR District). (1/15/04 Bologna Decl. ¶¶ 11, 15.) Due to the substantial size of the Redevelopment Project, the development plan and the LADA have been well publicized, and were discussed at frequent public hearings prior to its adoption. Plaintiffs attended at least some of those hearings, and have not contested that they at least knew about the July 1999 hearing, during which

the public use determination was made. Second, unlike in *Target Corp.,* Defendants have tried on numerous occasions to negotiate with Plaintiffs. Lastly, unlike in *Target Corp.,* there is no evidence in the record of any threat or other coercive action by Private Defendants to abandon the Redevelopment Project if Port Chester refused to exercise its eminent domain power over Plaintiffs' property.

Because the Constitution bars only taking for a public purpose without just compensation, Defendants are obligated to do no more than pay a reasonable sum for the Inside Properties. Plaintiffs' allegations of bad faith in this matter are insufficient to warrant an evidentiary hearing or the granting of a preliminary injunction staying the state court proceedings. Plaintiffs therefore have no right to have their property exempted from the Project so that they can develop it privately.

For the foregoing reasons, I deny Plaintiffs' Motion for a Preliminary Injunction enjoining the prosecution of the EDPL Article 4 proceeding relating to Plaintiffs' Inside Properties in the New York State Supreme Court.

The Clerk of the Court is ordered to extinguish the bond.